**SIGNED THIS: October 28, 2009**

_____

**THOMAS L. PERKINS**
**UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF ILLINOIS

IN RE:                                    )
                                          )
JONATHAN J. KUCHARZ,                      )          No.  09-81258
                                          )
                        Debtor.           )

## O P I N I O N

The sole issue is whether unemployment compensation is a benefit received under

the Social Security Act that is excluded from a Chapter 13 debtor's current monthly income.

The Debtor, Jonathan Kucharz (DEBTOR), received unemployment compensation totaling

$1,230 during the six-month period preceding the bankruptcy filing.  On Line 8 of his

amended Official Form 22C, as suggested by the language of the Form, he discloses the

unemployment compensation but claims it as a benefit under the Social Security Act that,

as such, does not need to be included in the calculation of his current monthly income.  The

Chapter 13 Trustee disagrees.

Current monthly income (CMI) is defined in the Bankruptcy Code as follows:

The term "current monthly income" —

(A)  means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on—

(i)  the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or

(ii)  the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii); and

(B) includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent), but *excludes benefits received under the Social Security Act*, payments to victims of war crimes or crimes against humanity on account of their status as victims of such crimes, and payments to victims of international terrorism (as defined in section 2331 of title 18) or domestic terrorism (as defined in section 2331 of title 18) on account of their status as victims of such terrorism. (Emphasis added).

11 U.S.C. § 101(10A).

Whether unemployment insurance payments are "benefits received under the Social Security Act" is a surprisingly difficult question.  Generally, a reference to Social Security benefits calls to mind payments under the Old-Age, Survivors, and Disability Insurance programs.  Unemployment insurance, however, although paid through state sponsored programs, does have roots in the federal Social Security Act and other federal legislation.

Enacted as part of President Roosevelt's New Deal legislation, the Social Security Act of 1935 (SSA) incentivized the states to adopt conforming laws to pay unemployment

insurance benefits to their involuntarily unemployed citizens.  The Congress rejected the alternative of a uniform national unemployment insurance system, preferring instead to preserve the autonomy of the states to adopt their own systems.  *New York Telephone Co. v. New York State Dept. of Labor,* 440 U.S. 519, 541 n.36, 99 S.Ct. 1328, 1341 n.36 (1979).  The states were given a wide range of judgment and broad freedom to set up the type of unemployment compensation system they preferred.  *Baker v. General Motors Corp.,* 478 U.S. 621, 633, 106 S.Ct. 3129, 3136 (1986).

The incentive for the states to act was a financial one, provided through the Federal Unemployment Tax Act (FUTA), 26 U.S.C. §§ 3301-3311.[1]  FUTA imposes an excise tax on wages paid by employers.  An employer, however, is allowed a credit of up to 90% of the federal tax for contributions the employer pays to a state fund established under a federally approved state unemployment compensation law.  All 50 states have unemployment insurance laws implementing the federal mandatory minimum standards of coverage.  *St. Martin Evangelical Lutheran Church v. South Dakota,* 451 U.S. 772, 775 n.3, 101 S.Ct. 2142, 2144 n.3 (1981).  The conditions attached to allowance of the credit are designed to assure that each state's program contains basic standard provisions.  *Charles C. Steward Mach. Co. v. Davis,* 301 U.S. 548, 575, 57 S.Ct. 883, 885 (1937).

In order to protect the employer contributions against loss, the states are required to invest the funds with the U.S. Treasury.  *Id.*  The states' funds are deposited and held in an "Unemployment Trust Fund."  42 U.S.C. § 1104.  Although the funds are aggregated for investment purposes, the U.S. Treasury maintains separate accounts for the deposits made

---

[1]FUTA appeared originally as Title IX of the SSA, but was moved to the Internal Revenue Code in 1939.

by each state and the earnings on the deposits.  42 U.S.C. § 1104(e).  The U.S. Treasury

remits the funds back to the states upon request on an as-needed basis.  42 U.S.C. § 1104(f).

In order for a state to retain its program certification, it must use the trust funds

solely for the payment of unemployment compensation benefits, exclusive of expenses of

administration.  42 U.S.C. § 503(a)(5); 26 U.S.C. § 3304(a)(4).  A state's expenses for

operating its unemployment insurance system are paid for through federal grants.  42

U.S.C. §§ 1101(c)(1)(A) and 501-504.

The Unemployment Trust Fund includes an extended unemployment compensation

account to provide funding for payment of extended benefits during times of high

unemployment.  42 U.S.C. § 1105.  States are required to provide such extended benefits

pursuant to Section 3304(a)(11) of the Internal Revenue Code and the Federal-State

Extended Unemployment Compensation Act of 1970, Pub. L. 91-373, Title II, Aug. 10, 1970,

84 Stat. 708 (the "EUCA").[2]  From time to time, Congress legislates additional weeks of

extended benefits on top of the 26 weeks provided by most states. Section 204 of the EUCA

provides that the federal government is to pay one-half of the extended benefits paid by

the state.  Neither the FUTA nor the EUCA is part of the SSA.

By providing for federal financing of just the administrative expenses of the state-

created and managed unemployment insurance systems, Title III of the SSA was intended

to furnish federal money for the states' operational costs as an inducement to the states to

adopt programs that would achieve the objectives set forth as minimum requirements for

such programs. *Jenkins v. Bowling,* 691 F.2d 1225, 1229 (7th Cir. 1982).  Rather than creating

---

[2]I.R.C. § 3304(a)(11), part of the FUTA, provides that extended compensation shall be payable as provided by the Federal-State Extended Unemployment Compensation Act of 1970, the full text of which is set forth as a note to Section 3304.

a uniform federal scheme for unemployment compensation, the states were encouraged to run their own programs, with federal involvement existing primarily through tax incentives. *Ohio Bureau of Employment Services v. Hodory,* 431 U.S. 471, 483, 97 S.Ct. 1898, 1905-06 (1977).

Unemployment insurance claims are submitted to, evaluated and paid or denied by state officials implementing state law. Appeals are heard by state officials. Illinois, for example, has enacted a comprehensive code of intricate unemployment insurance laws, the Unemployment Insurance Act, 820 ILCS 405/100-3200. The Illinois Department of Employment Security was created to administer those laws and to adopt regulations to effect such administration. 820 ILCS 405/1700 and 1701. Benefits are payable as determined under state law and the regulations promulgated thereunder, independent of the SSA and FUTA.[3]

Each state is required to collect unemployment taxes sufficient to pay the benefits mandated by its laws. In the event of a shortfall of state funds, the states may borrow from the U.S. Treasury, 42 U.S.C. § 1321, or raise funds on their own. The Illinois Unemployment Insurance Trust Fund Act authorizes the issuance of revenue bonds for this purpose.[4] 30 ILCS 440/1 *et.seq.*

---

[3]If the SSA was repealed, the Illinois Unemployment Insurance Act would remain in full force and effect. Although intended to be complementary, the federal and state laws are distinct and separate, each able to exist and function without the other. 81 C.J.S. *Social Security and Public Welfare* § 284.

[4]The audited financial statements for the Illinois Unemployment Compensation Trust Fund state that the Fund is "intended to be self-supporting (Note 1) and that the employer contribution rate is "designed to recover the payment of unemployment benefits plus maintain a reasonable balance to protect the solvency of the fund if unemployment rates rise significantly," (Note 2(b)). State of Illinois Dept. of Emp. Security, Individual Nonshared Proprietary Fund, Financial Audits for the year ended June 30, 2008. The 2008 audit reports unemployment taxes received of $2,045,930,000, benefits paid of $2,009,206,000, and a positive Net Asset balance in the Illinois Unemployment Compensation Trust Fund of $2,391,158,000, the entire amount of which is restricted for use in paying unemployment compensation benefits. *Id.*

Shortly after passage of the SSA, the Supreme Court had occasion to directly address the resulting interrelationship between the states and the federal government with respect to unemployment compensation.  The constitutionality of the unemployment compensation provisions of the SSA was at issue in *Charles C. Steward Mach. Co. v. Davis, supra*.  The payroll tax was attacked as a coercion of the states in contravention of the Tenth Amendment.  The provisions were also challenged as requiring an unconstitutional surrender by the states of powers essential to their sovereignty.  Writing for a 5-4 majority, Justice Cardozo rejected these challenges, recognizing that the taxes from which unemployment benefits are paid are collected pursuant to laws enacted by the states, and that benefits are paid under programs administered by state officials.  57 S.Ct. at 892-93.  The SSA's purpose to encourage states to adopt their own unemployment insurance programs was held to be a permissible inducement of state action rather than an unconstitutional coercion.  Because the states were free to adopt or not adopt an unemployment insurance program, and retained administrative control over their own programs, they were not deemed to have surrendered sovereign powers to the federal government.  57 S.Ct. at 893-96.

In a decision issued the same day, the Supreme Court upheld the constitutionality of the Alabama Unemployment Compensation Act.  *Carmichael v. Southern Coal & Coke Co.,* 301 U.S. 495, 57 S.Ct. 868 (1937).  Writing for a 5-4 majority, Justice Stone rejected a challenge to the Alabama law as an unconstitutional surrender of its sovereign power.  Emphasizing the retention of state control reflected in both the SSA and the Alabama statute, the court reasoned as follows:

> As the opinion in the Chas. C. Steward Machine Co. case points out, full liberty of action is secured to the state by both statutes.  The unemployment

compensation fund is administered in accordance with state law by the state commission. The statute may be repealed at the will of the legislature, and in that case the state will be free to withdraw at any time its unexpended share of the Unemployment Trust Fund from the treasury of the United States, and to use it for any public purpose. And, for the reasons stated in the opinion in the Chas. C. Steward Machine Co. case, we conclude that the deposit by the state of its compensation fund in the Unemployment Trust Fund involves no more of a surrender of sovereignty than does the choice of any other depository for state funds. The power to contract and the power to select appropriate agencies and instrumentalities for the execution of state policy are attributes of state sovereignty. They are not lost by their exercise.

57 S.Ct. at 880.

Two courts have held that unemployment compensation is a benefit received under the Social Security Act that is properly excluded from the debtor's CMI. *In re Munger,* 370 B.R. 21 (Bankr.D.Mass. 2007); *In re Sorrell,* 359 B.R. 167 (Bankr.S.D.Ohio 2007). A third court holds to the contrary. *In re Baden,* 396 B.R. 617 (Bankr.M.D.Pa. 2008). The provision is ambiguous on its face, as it is amenable to two conflicting interpretations. *See Baden,* 396 at 621-22.

The legislative history is inconclusive. The passage of BAPCPA in 2005 was the end of a long and winding road. Early drafts of the legislation did not exclude Social Security benefits from CMI. The exclusion was first proposed in an amendment offered by Representative Jackson Lee during a mark-up of H.R. 833 by the House Judiciary Committee in April 1999, which was defeated by voice vote. The full House began its consideration of H.R. 833 on May 5, 1999. A motion by House Judiciary Committee Ranking Member Conyers to recommit with instructions requiring the bill's means test provisions to be amended to exclude benefits received under the Social Security Act from

its income component passed by voice vote.  *See* Susan Jensen, *A Legislative History  of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005*, 79 AM. BANKR. L. J.  485 at 523-28 (2005).  The exclusion survived intact throughout the six subsequent years that the law remained pending in Congress.  It has been suggested that the exclusion was intended to protect retirement benefits from creditors.  Marianne B. Culhane and Michaela M. White, *Catching Can-Pay Debtors: Is the Means Test the Only Way?* 13 Am. Bankr. Inst. L. Rev. 665 at 674 (2005).  That statement, however, is unsourced and can only be taken as the opinion of the authors.

The combination of the historical link to the SSA and the element of federal-state collaboration on behalf of unemployment compensation gives rise to the ambiguity.  On one hand, the funds used to pay the benefits are state funds, raised by employer contributions required by state law, paid as determined by state statutes and regulations, all as managed by a large state bureaucracy staffed by state officials and employees.  On the other hand, under the auspices of the SSA and FUTA, the federal government pays most, if not all, of the operating expenses associated with each state's unemployment insurance administration.[5]

But the inquiry is more specific than whether there is merely an historical link between the SSA and unemployment compensation. Unemployment payments are excluded only if they are properly characterized as benefits received under the Social

---

[5] As pointed out by Justice Cardozo, the SSA accomplished its incentivizing purpose.  Prior to the SSA, many states were reluctant to legislate unemployment insurance that imposed new taxes on their businesses for fear of putting themselves at economic disadvantage compared with their neighbors.  By May, 1937, 42 states had enacted such legislation in reliance upon the SSA's tax and credit scheme. *Charles C. Steward Mach. Co. v. Davis,* 301 U.S. at 587-88, 57 S.Ct. at 891.

Security Act. It is not sufficient that the benefits are merely "related to" or "envisioned by" or "induced by" the SSA. More is required. They must have been received *under* the SSA.

The preposition "under" is both the cause of and the key to unlock the mystery. In the context of its usage in Section 101(10A), "under" means "required by" or "in accordance with." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED (1976). Neither the SSA nor FUTA requires the states to enact an unemployment insurance program. As determined by the Supreme Court, inducement is not coercion, and the unemployment insurance programs that were adopted in all 50 states are truly state, not federal, programs. Unemployment benefits are paid as required by state law, not by the SSA. To the extent that extended benefits may, from time to time, be required by federal law, and paid, in part, with federal funds, they are required by the EUCA and by stand-alone bills that are passed in times of high unemployment, not by the SSA or any amendments to the SSA. Thus, a purely textual analysis favors the conclusion that unemployment benefits are not received under the SSA.

Because the language of the provision is ambiguous, it is appropriate to also consider a contextual analysis. A statutory provision's context consists not only of other sentences and related provisions, but also of the real-world situation to which the language pertains. *Matter of Handy Andy Home Improvement Centers, Inc.,* 144 F.3d 1125, 1128 (7th Cir. 1998). Ambiguities should be examined in light of the law's object and policy, since it may be that only one of the permissible meanings produces a substantive result that fulfills or is consistent with the law's purpose. *United Sav. Ass'n of Texas v. Timbers of Inwood Forest*

*Associates, Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 630 (1988); *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 51, 107 S.Ct. 1549, 1555 (1987).

The major purpose of the means test implemented by BAPCPA is to identify those Chapter 7 filers who have the ability to repay a portion of their debts and to force them into Chapter 13 if they wish to obtain bankruptcy relief. *In re Ross-Tousey,* 549 F.3d 1148, 1151 (7th Cir. 2008). The means test regularizes this inquiry by using a formula to determine a debtor's ability to pay. Under the means test formula, a debtor's disposable income is determined by subtracting certain allowed monthly expenses from his CMI.

The same CMI calculation is used in Chapter 13 as the income component that is part of the projected disposable income determination. 11 U.S.C. § 1325(b). Chapter 13 plan payments are based, in part, on the income that a debtor is expected to receive during the term of the plan. The CMI calculation uses a 6-month lookback period as an indicator of future income, including earnings from employment. So the CMI formula serves a predictive function.[6]

Debtors who are retired or who no longer work because of a disability usually have a predictable fixed income stream. Working debtors, however, are subject to a variety of unforeseeable events that affect their jobs and income, such as plant closings, downsizing, layoffs, reduction in hours, job changes, etc. Unemployment compensation is a temporary, partial substitute for wages lost due to the involuntary unemployment of one who intends to return to the workforce. The theory behind CMI is premised upon the assumption that

---

[6]Courts disagree about whether the formulaic calculation of projected disposable income for over-median debtors in Chapter 13 is the mandatory end result for plan confirmation purposes, or only the starting point. *See, In re Turner,* 574 F.3d 349 (7th Cir. 2009) (collecting cases).

their recent earnings history is a valid predictor of how much debtors are likely to earn in the future. Since unemployment benefits replace lost wages, including those benefits in the CMI calculation is consistent with the predictive purpose of the provision. Excluding those benefits would be inconsistent with the statute's policy and purpose. The fallacy of using $0 during periods of temporary unemployment as a predictor of future earnings once the debtor is reemployed seems obvious. In this regard, unemployment compensation is unlike old age, survivors and disability benefits received under the SSA, and is unlike payments to victims of war crimes, crimes against humanity or terrorism. None of those excluded benefits is a temporary substitute for lost wages. So a contextual analysis weighs in favor of including unemployment benefits in a debtor's CMI.

An additional rationale for not excluding unemployment benefits from CMI follows from an applicable canon of statutory construction. Remedial legislation should be construed broadly to effectuate its purpose. *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553 (1967). A corollary is that exceptions to remedial legislation are construed narrowly. *E.E.O.C. v. Fox Point-Bayside School Dist.,* 772 F.2d 1294, 1302 (7th Cir. 1985).

It is widely acknowledged that the means test is intended to combat perceived fraud and abusive filings through objective standards by shifting can-pay debtors from Chapter 7 to Chapter 13. *In re Rudler,* 576 F.3d 37 (1st Cir. 2009); *In re Jensen,* 407 B.R. 378 (Bankr.C.D.Cal. 2009); *In re Harvey,* 407 B.R. 867 (Bankr.W.D.Va. 2009); *In re Vernon,* 385 B.R. 342 (Bankr.M.D.Fla. 2008). BAPCPA's means test provisions are properly characterized as remedial in nature. *Justice v. Advanced Control Solutions, Inc.,* 2008 WL 4368668 at *4 (W.D.Ark. 2008).

11

The Code definition for CMI defines income as broadly as possible.  It encompasses the debtor's income from "all sources," "without regard to whether such income is taxable." 11 U.S.C. § 101(10A)(A).  It includes "any amount paid by any entity" that helps pay the debtor's household expenses.  11 U.S.C. § 101(10A)(B).  The definition then carves out three exceptions to the general rule of all-inclusiveness, excluding payments to victims of certain crimes, of terrorism, and benefits received under the SSA.  As an exception to remedial legislation, the exclusion of benefits received under the SSA should be construed narrowly.  The ambiguity should be resolved in favor of including such benefits within CMI.

A textual and contextual analysis, as well as a canon of statutory construction, all support the conclusion that unemployment benefits are not "received under the Social Security Act," as that phrase is used in Section 101(10A).  This Court agrees with *Baden,* and disagrees with *Munger* and *Sorrell.*  The DEBTOR'S attempt to exclude the unemployment compensation received in the six months before bankruptcy from the calculation of his Current Monthly Income must be denied.  The Chapter 13 Trustee's objection should be granted.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  A separate Order will be entered.

###